IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL REYES MIRABAL, | No. C-06-02257 MMC |
| Petitioner, | **ORDER DENYING PETITIONER'S MOTION FOR EVIDENTIARY HEARING; DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| S.W. ORNOSKI, | |
| Respondent. | (Docket Nos. 1, 10) |

Before the Court is the petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, filed by Michael Reyes Mirabal, a California state prisoner. Petitioner claims that the California Board of Prison Terms ("Board") violated his federal constitutional rights by (1) denying him parole in 2002 and 2004 without sufficient evidence to support its decision that his release would pose an unreasonable risk to public safety and without individualized consideration, and (2) denying him parole in 2002 and 2004 in violation of his plea agreement. Respondent has filed an answer to the petition; petitioner has filed a traverse. Also before the Court is petitioner's subsequently-filed motion for an evidentiary hearing. Respondent has filed opposition to the motion, to which petitioner has replied. For the reasons set forth below, the Court rules as follows.

**BACKGROUND**

On July 17, 1981, the Superior Court of California, County of Los Angeles ("Superior

1 Court"), sentenced petitioner to a term of 15 years to life in prison upon acceptance of
2 petitioner's plea of guilty to a charge of second degree murder.  (See Answer Ex. 1.)  The
3 events giving rise thereto as summarized by the Superior Court are as follows:

4     Petitioner was introduced to the victim in a bar by one of petitioner's crime partners.
5 (See Petition Ex. 1 (Superior Court of the State of California, County of Los Angeles, Order
6 re: Writ of Habeas Corpus, filed Feb. 24, 2005, ("Superior Court Order")) at 2:5-6.)
7 Petitioner and his crime partners accompanied the victim to his home, where the victim was
8 struck over the head with a wine bottle, smothered with a pillow, and strangled.[1]  (See id. at
9 2:6-8.)  After the victim was murdered, petitioner and his crime partners wrapped the body
10 in a sheet, intending to remove him from the apartment, but were unable to move the body
11 because the victim was too heavy.  (See id. at 2:8-10.)  Petitioner admitted to taking a
12 clock, television, and items from the victim's refrigerator.  (See id. at 2:11-12.)  Petitioner
13 thereafter fled to Montana, where he was arrested driving the victim's car.  (See id. at 2:12-
14 13.)

15     On December 5, 2002, the Board found petitioner unsuitable for parole, stating he
16 "would pose an unreasonable risk of danger to society or a threat to public safety if
17 released from prison."  (See Answer Ex. 7 at 78:8-13.)  The Board explained, "The offense
18 was carried out in an especially cruel and callous manner.  The victim was abused and
19 defiled . . . [a]nd the motive for the crime was inexplicable and very trivial in relation to the
20 offense."  (See id. at 78:14-18.)  The Board further noted, "The victim was beaten with a
21 wine bottle, smothered with a pillow, and strangled with a shirt."  (See id. at 79:3-5.)[2]  The
22 Board further observed that a report prepared on September 5, 2002 by Erich

---

[1] During the hearing, petitioner admitted only to smothering the victim and "indicated his crime partners committed the other acts."  (See Petition Ex. 1 (Superior Court Order) at 2 n.4.)

[2] The Board also stated the victim had burn marks on his scrotum from a cigarette. (See Answer Ex. 7 at 79:5-6.)  The Superior Court, in its order denying petitioner's petition for a writ of a habeas corpus, noted that the burn marks were not discussed during the hearing "but suddenly appeared in the Board's decision."  (See Petition Ex. 1 at 2 n.4.)  The court disregarded such assertion, stating "the source of the information is unclear and not supported by any other evidence before this Court."  (See id.)

1 Rueschenberg, Ph.D., a forensic psychologist, was "not totally supportive of release."  (See
2 Answer Ex. 7 at 79:10-13; see also Traverse Ex. D (Mental Health Evaluation, dated
3 September 5, 2002 ("Rueschenberg Report")) at 6.)  In his report, Dr. Rueschenberg
4 discussed previous psychological reports, including one prepared by J. Tyler, Ph.D. on July
5 17, 2000, which stated that petitioner "'would be a suitable candidate for parole.'"  (See
6 Traverse Ex. D (Rueschenberg Report) at 3.)  Dr. Ruschenberg opined that petitioner
7 represented "a low-to-moderate risk for violence in the community," and that petitioner's
8 offense "was a senseless crime that was apparently motivated by opportunistic material
9 gain and hostility."  (See id. at 6.)  The report further stated, "Mr. Mirabal has had difficulty
10 accounting for his actions in the crime, perhaps a reflection of his intoxicated state at the
11 time, and a reluctance to acknowledge the underlying feelings of anger and hostility he
12 harbored."  (See id.)  The Board also noted that the district attorney opposed parole.  (See
13 Answer Ex. 7 at 80:21-24.)  The Board concluded that petitioner needed to participate in
14 additional self-help programming because he "continue[d] to be unpredictable and a threat
15 to others."  (See id. at 80:25-81:4.)  The Board commended petitioner for "remaining
16 disciplinary-free, participating in self-help, [and] upgrading educationally and vocationally,"
17 but found, "[t]hese positive aspects of his behavior . . . [did] not outweigh the factors of
18 unsuitability."  (See id. at 81:4-9.)

19 On August 26, 2004, the Board again concluded petitioner was "not suitable for
20 parole and would pose an unreasonable risk of danger to society or a threat to public safety
21 if released from prison," (see Answer Ex. 8 at 120:6-12), explaining:

22 The offense was carried out in a very cruel and actually a callous manner, in
that no thought was given to the feelings of the victim or what he was
23 experiencing at the time.  And the offense was carried out dispassionately,
and the victim was abused and defiled during the offense . . .
24
25 (See id. at 120:12-17.)  The Board further found petitioner's motive was not "anywhere near
26 serious enough to be able to take a person's life."  (See id. at 120:22-26.)  Additionally, the

Board noted that petitioner had been written up for rules violations[3] on five occasions during his incarceration, the most recent of which was issued November 4, 1985 for possession of marijuana. (See Answer Ex. 8 at 122:6-9.) As noted by the Board, petitioner had eighteen "counseling chronos,"[4] the most recent of which was issued August 11, 2001 for "excessive kissing with his wife in the . . . visiting room." (See id. at 122:9-13.) The Board also noted the district attorney's continued opposition to parole. (See id. at 125:22-25.)

The Board also found that a July 13, 2004 report prepared by Adam Goldyne, M.D., a psychiatrist, was not supportive of release. (See id. at 122:13-16; see also Traverse Ex. C (Mental Health Evaluation, dated July 13, 2004 ("Goldyne Report")) at 7.) In his report, Dr. Goldyne noted "there [was] still some level of denial/lack of insight with regard to his crime," and that petitioner "seemed to take responsibility at certain moments in the interview, but at others described his crime in a manner which suggested disavowal of responsibility." (See Traverse Ex. C (Goldyne Report) at 5.) The report further stated:

> It is still unclear to me whether Mr. Mirabal's statements of remorse/insight are superficial attempts to say what is expected or whether they reflect a new capacity . . . . Mr. Mirabal's levels of insight and remorse have deepened since his [1992] Category X [report], but I feel they [are] less promising than suggested by more optimistic subsequent reports and believe that they still reflect anti-social vulnerability.

(See id.) Dr. Goldyne determined that "Mirabal is likely [to be] at moderate risk for violence recidivism." (See id. at 6.)

Petitioner, on the other hand, submitted a report prepared by Melvin Macomber, Ph.D., a forensic psychologist who interviewed petitioner and reviewed prior psychological reports. (See Answer Ex. 8 at 61:1-3, 63:12-16; see also Traverse Ex. C (Clinical

---

[3] The Board refers to the violations as "115s." (See id. at 122:6-9.) The term "'115' is the shorthand reference . . . for a rules violation charge because inmate misconduct is reported on California Department of Corrections Form 115." Wilson v. Terhune, 319 F.3d 477, 480 n.3 (9th Cir. 2003); see also Cal. Code. Regs. tit. 15, § 3312(a)(3).

[4] "When similar minor misconduct recurs after verbal counseling or if documentation of minor misconduct is needed, a description of the misconduct and counseling provided [is] documented on a CDC Form 128-A, Custodial Counseling Chrono." See Cal. Code Regs. tit. 15, § 3312(a)(2).

Assessment, dated August 2, 2004 ("Macomber Report")) at 1.) Dr. Macomber opined that petitioner's risk of dangerousness was "lower than the average citizen in the community." (See Traverse Ex. C (Macomber Report) at 17.) Dr. Macomber criticized Dr. Goldyne's determination that petitioner lacked insight and remorse; in his view, such a determination was "due to [Dr. Goldyne's] antagonistic and hostile approach." (See id. at 15.)

The Board recognized petitioner's "minimal criminal history, only as a juvenile, none as an adult," for "smoking marijuana and car theft or joyriding," (see Answer Ex. 8 at 121:17-21), and that petitioner had "good parole plans and . . . letters of support," (see id. at 125:20-22). The Board commended petitioner for "utilizing his time very well" in prison and recognized his involvement in numerous programs. (See id. at 125:25-126:22.) The Board also made note of "a number of laudatories in [petitioner's] file for his work performance, for his porter skills, and for Toastmasters, Teachers Assisting in Literacy, and his work ethic." (See id. at 126:22-26.) Ultimately, the Board again found petitioner unsuitable for parole. (See id. at 120:6-12.)

On December 23, 2003, petitioner filed a petition for a writ of a habeas corpus in the Superior Court. (See Answer Ex. 3 at 001.) The Superior Court denied the petition on February 24, 2005, holding "the record contains 'some evidence' to support the Board's finding that Petitioner is unsuitable for parole." (See Petition Ex. 1 at 1:22-23.) Petitioner subsequently filed a petition for a writ of habeas corpus in the California Court of Appeal and a petition for review in the California Supreme Court, both of which were summarily denied. (See Answer Exs. 5-6.) Petitioner thereafter filed the instant petition.

## DISCUSSION

### A. PETITION FOR WRIT OF HABEAS CORPUS

#### 1. Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the Court may grant a habeas petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." See 28 U.S.C. § 2254(d). In determining whether to grant a petition, the court must analyze the state court's "last reasoned decision." Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). Here, the "last reasoned decision" is the Superior Court Order. (See Answer Exs. 3, 5, 6.)[5]

A decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." See Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). An "unreasonable application" of federal law occurs "if the state court identifies the correct governing legal principle from the [Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." See id. at 75. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." Id. "The state court's application of clearly established law must be objectively unreasonable." Id. An "unreasonable determination of the facts" occurs where "an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record" or "that the state court's fact-finding process was adequate." See Taylor v. Maddox, 366 F.3d 992, 1000 (2004).

---

[5] The question of whether the Board's 2004 decision violated petitioner's constitutional rights was not "adjudicated on the merits" in the state courts. (See Petition Ex. 1 at 1 n.1.) The Superior Court denied petitioner's request to consider the 2004 decision, which took place after the petition was filed, (see id.), and although the 2004 decision was raised in the petitions before the Court of Appeal and Supreme Court, those petitions were summarily denied. (See Answer Exs. 5, 6.) Thus, this Court will determine whether the state courts' denial of the habeas petition, with respect to the 2004 decision, "was 'objectively unreasonable' based on its independent reading of the record." See Lewis v. Mayle, 391 F.3d 989, 996 (9th Cir. 2004).

6

### 2. Denial of Parole

Petitioner contends the Board violated his Constitutional rights by denying him parole in 2002 and 2004 on the grounds that the Board's decisions were not supported by some evidence and that the Board failed to give him individualized consideration.

#### a. Some evidence

Petitioner argues that the Board disregarded evidence in the 2002 hearing that petitioner had no criminal history beyond the commitment offense, except for "one juvenile incident for marijuana"; the commitment offense was the result of "significant stress that had built up in [petitioner] over a period of months"; petitioner "never had a violent disciplinary during his entire incarceration"; his "last rules violation report (CDC 115) was in 1985"; he participated in numerous self-help groups; he received a "series of laudatory chronos" for his work ethic and community service; he took college classes; he "has more than one vocation and remains a member of a trade union"; a prior psychiatric report by Dr. Tyler in 2000 found petitioner suitable for parole; and that petitioner received numerous letters of support. (See Petition at 11-17.) Petitioner further argues that the Board, in the 2004 hearing, disregarded a counselor's report that petitioner was a "model prisoner" and that petitioner had "extensive support from his family, from friends, and the community, including several job offers and excellent parole plans." (See id. at 17, 19.) Additionally, petitioner asserts, the Board, in 2004, disregarded Dr. Macomber's report, which criticized Dr. Goldyne's report and opined that petitioner's "risk of dangerousness if he is released to the community is lower than the average citizen in the community." (See id. at 19.)

In California, prisoners have a federally protected liberty interest in parole. See Sass, 461 F.3d at 1127; McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir. 2002). According to "clearly-established" federal law, a parole board's decision must be supported by "some evidence" to satisfy due process. See Sass, 461 F.3d at 1128-29; McQuillion, 306 F.3d at 904. "[The] some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'" Sass, 461 F.3d at 1129 (quoting Superintendent v. Hill, 472 U.S. 445,

7

1 457 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.'" Id. at 1128 (quoting Hill, 472 U.S. at 455-56.) "Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the Board. See id. (quoting Hill, 472 U.S. at 455-56.)

The criteria for determining whether a life prisoner is suitable for parole are set forth in title 15, § 2402, of the California Code of Regulations. The opening paragraph of § 2402(a) states: "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." See Cal. Code Regs. tit. 15, § 2402(a). Circumstances "tending to indicate unsuitability" for parole include whether (1) "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner"; (2) the prisoner has a "[p]revious [r]ecord of [v]iolence"; (3) the prisoner has an "[u]nstable [s]ocial [h]istory"; (4) the prisoner has previously committed a "[s]adistic [s]exual [o]ffense"; (5) "[t]he prisoner has a lengthy history of severe mental problems related to the offense"; and (6) "[t]he prisoner has engaged in serious misconduct in prison or jail." See Cal. Code Regs. tit. 15, § 2402(c). Factors to be considered in determining whether the offense was committed "in an especially heinous, atrocious or cruel manner" include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

See id. Circumstances "tending to indicate suitability" for parole include whether (1) "[t]he prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims"; (2) the prisoner has a "[s]table [s]ocial [h]istory"; (3)

"[t]he prisoner performed acts which tend to indicate the presence of remorse; (4) "[t]he prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time"; (5) "the prisoner suffered from Battered Woman Syndrome"; (6) "[t]he prisoner lacks any significant history of violent crime"; (7) "[t]he prisoner's present age reduces the probability of recidivism"; (8) "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release"; and (9), "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." See Cal. Code Regs. tit. 15, § 2402(d).

The Board's 2002 and 2004 denials of parole were both based in part on findings that petitioner posed an unreasonable risk of danger to public safety because "[t]he offense was carried out in an especially cruel and callous manner." (See Answer Exs. 7 at 78:14-15, 8 at 120:12-13.) Specifically, the Board stated, the victim was "abused and defiled" during the offense and "the motive for the crime was inexplicable and very trivial in relation to the offense." (See Answer Exs. 7 at 78:15-18, 8 at 120:15-26.) Based on evidence that the victim was struck over the head with a wine bottle, drugged, smothered with a pillow, and strangled, the Board had "some evidence" that the victim was abused and defiled. (See Petition Ex. 1 at 2:7-8.) Further, because petitioner conceded, as reflected in a December 2002 "Life Prisoner Evaluation Report," that he had no motivation for killing the victim and that he was merely acting at the request of his cousin, the Board had "some evidence" to support its finding that the motive for the crime was very trivial in relation to the offense. (See Answer Ex. 10 at 2.)

Petitioner contends the Board's continued reliance on "the stale, unchanging facts of the commitment offense" violates due process. (See Petition at 3.) The Ninth Circuit, however, has held that a denial of parole based on an unchanging factor, such as the gravity of the offense, may constitute "some evidence" to justify a denial of parole. See Irons v. Carey, No. 05-15275, 2007 WL 656345, at *4-5 (9th Cir. Mar. 6, 2007) (holding Board's sole reliance on commitment offense in denying parole comported with due process); Sass, 461 F.3d at 1129 (holding Board's reliance "on the gravity of [petitioner's]

9

1  convicted offenses in combination with his prior offenses . . . amount[ed] to some evidence
2  to support the Board's determination"); Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003)
3  ("[T]he parole board's sole supportable reliance on the gravity of the offense and conduct
4  prior to imprisonment to justify denial of parole can be initially justified as fulfilling the
5  requirements set forth by state law.")  Although the Ninth Circuit, in Biggs, stated that "[a]
6  continued reliance in the future on an unchanging factor . . . runs contrary to the
7  rehabilitative goals espoused by the prison system and could result in a due process
8  violation," see Biggs, 334 F.3d at 917, this exception has never been applied by the Ninth
9  Circuit.[6]

10  In the instant case, petitioner served twenty-three years in prison, eight years
11  beyond the minimum number of years required by his sentence, and a period of time longer
12  than that at issue in Biggs, Sass, and Irons.  See Biggs, 334 F.3d at 912-13 (noting parole
13  hearing at issue was held fourteen years after conviction); see also Sass, 461 F.3d at
14  1125-26 (noting latest parole hearing at issue was held twelve years after conviction); see
15  also Irons, 2007 WL 656345, at *1 (noting parole hearing at issue was held sixteen years
16  after conviction).   Nevertheless, the Board here had additional bases beyond those
17  present in Biggs, Sass, or Irons to support its denial of parole.  While in prison, petitioner
18  received five "rules violations" and eighteen "counseling chronos." (See Answer Ex. 8 at
19  122:6-13.)  In Irons, the Ninth Circuit found unpersuasive the fact that the petitioner therein
20  had received no disciplinary charges throughout his confinement.  See Irons, 2007 WL
21  656345, at *1.  Moreover, although petitioner's last rules violation occurred nineteen years
22  prior to the 2004 hearing and seventeen years prior to the 2002 hearing, petitioner's last
23  counseling chrono occurred just three years prior to the 2004 hearing and one year prior to
24  the 2002 hearing.  (See id. at 122:7-11; Answer Ex. 1.)  In Biggs, the Ninth Circuit

---

[6] Petitioner points to cases such as Rosenkrantz v. Marshall, 444 F. Supp. 2d 1063, 1080-82 (C.D. Cal. 2006) (holding Board's sole reliance on nature of crime for fifth time in denying parole violated due process) and Martin v. Marshall, 431 F. Supp. 2d 1038, 1047 (N.D. Cal. 2006) (holding Governor's sole reliance on offense and petitioner's prior conduct violated due process).  Those cases, however, were decided before Sass and Irons, which are controlling authority.

1  discounted the thirteen discipline-free years the petitioner had spent after his sole violation
2  for failing to follow instructions.  See Biggs, 334 F.3d at 912.
3        Further, although petitioner had received a favorable psychological report in 2000,
4  the Board, in 2002, was presented with a report the Board found "not totally supportive of
5  release," in which a psychologist found petitioner had a "low-to-moderate risk for violence in
6  the community," (see Traverse Ex. D (Rueschenberg Report) at 6; see also Answer Ex. 7
7  at 79:10-17); in 2004, the Board was presented with a psychiatric report the Board found
8  "not supportive of release," in which Dr. Goldyne stated petitioner still had "some level of
9  denial . . . with regard to his crime," that it was "unclear" whether petitioner's statements of
10 remorse "[were] superficial attempts to say what is expected," and that petitioner was "at
11 moderate risk for violence recidivism," (see Traverse Ex. C (Goldyne Report) at 5-6; see
12 also Answer Ex. 8 at 122:13-16).  Moreover, unlike Biggs, where the petitioner received
13 positive psychological reports showing he was remorseful and had taken responsibility for
14 his role in the crime, see Biggs, 334 F.3d at 916, petitioner's 2002 psychological report
15 noted that petitioner "has had difficulty accounting for his actions in the crime . . . and a
16 reluctance to acknowledge underlying feelings of anger of hostility he harbored," (see
17 Answer Ex. 7 at 80:5-11), and his 2004 psychological report questioned the sincerity of his
18 statements of remorse, (see Answer Ex. 8 at 123:2-23).
19       Lastly, other circumstances presented in the instant action are not materially
20 distinguishable from those found not to warrant the granting of a habeas petition in Irons,
21 Sass, and Biggs.  Here, petitioner received numerous "laudatory chronos," attended college
22 classes, and had vocational skills in construction and as an airline mechanic.  (See Answer
23 Ex. 7 at 26:16-20, 29:17-27, 68:3-11.)  The petitioner in Irons was "extremely industrious" in
24 prison, maintained "average to exceptional job performance in every position he ha[d]
25 occupied," and "received certificates of completion in several vocational training programs."
26 See Irons, 2007 WL 656345, at *1.  Likewise, in Sass, the petitioner displayed "exemplary
27 conduct in prison," had "detailed plans" for his release, received vocational training and
28 certificates, and "had taken college classes, for which he received all A's except for one B

11

minus." See Sass, 461 F.3d at 1136 n.16 (Reinhardt, dissenting).   Similarly, the petitioner in Biggs was a "model inmate," received praise from his supervisors for his "skills and efforts," received certification from the FAA in two aviation programs, and earned Associate's, Bachelor's and Masters in Business Administration degrees. See Biggs, 334 F.3d at 912.  The Ninth Circuit nonetheless found the petitioners' accomplishments in Irons, Sass, and Biggs insufficient to require a grant of parole.  See Irons, 2007 WL 656345, at *6; Sass, 461 F.3d at 1129; Biggs, 334 F.3d at 916.

In sum, the Board had "some evidence" to support its decisions to deny petitioner parole in both 2002 and 2004.  See Sass, 461 F.3d at 1129.

### b. Systematic Bias

Petitioner further contends, however, that he did not receive individualized consideration because the Board is biased against all prisoners convicted of murder.  A prisoner is entitled to "have his release date considered by a parole board that [is] free from bias or prejudice.  See O'Bremski v. Maass, 915 F.2d 418, 422-23 (9th Cir. 1990).

Petitioner contends that Governor Schwarzenegger, as did Governor Davis before him, appointed commissioners to the Board who would comport with his policy to rarely parole murderers.  To support his contention that the Board under Governor Davis was biased, petitioner provides statistical data to show that the Board rarely granted parole to murderers.  In that regard, petitioner cites to In re Rosenkrantz, 29 Cal. 4th 616, 685 (2002), in which the petitioner presented evidence that from January 1999 to April 2001, the Board "held 4,800 parole suitability hearings and granted parole to 48 inmates"; additionally, petitioner alleges, without citation, that as of July 3, 2003, the Board granted parole to only 230 murderers out of the last 12,000 parole hearings, (see Petition at 9). Petitioner further alleges, again without citation, that Governor Davis granted parole to only 8 out of 267 prisoners convicted of murder, and that the commissioners he appointed to the Board shared his personal view, which, as characterized by petitioner, is that "life in prison without parole is the just punishment for murderers and that public safety requires the continued and permanent incarceration of murderers." (See Petition at 10.)  According to

1 petitioner, "[t]he handful of grants of parole given by the Board has involved prisoners
2 whose crimes were mitigated and/or who made far more than the ordinary or normal
3 showing of suitability for parole." (See Petition at 10.) Petitioner offers no data, either with
4 or without citation to any source thereof, for his claim that Governor Schwarzenegger, or
5 the Board he appointed, was biased or operated under a similar policy to rarely grant
6 parole to prisoners convicted of murder.

7 Petitioner's allegations are insufficient to entitle him to habeas relief. To the extent
8 statistical data exists showing the Board, under Governor Davis, rarely granted parole to
9 prisoners convicted of murder, such data "provides no proof of the board's systematic bias
10 against parole." See Cosio v. Kane, No. C 05-1966 CRB (PR), 2007 WL 518599, at *6
11 (N.D. Cal. Feb. 12, 2007). A showing that a relatively small number of such prisoners were
12 granted parole does not establish that the Board was biased, as opposed to establishing
13 that those prisoners did not merit parole. Cf. Likety v. United States, 510 U.S. 540, 555
14 (1994) (holding "[j]udicial rulings alone almost never constitute a valid basis for a bias or
15 partiality motion" for recusal of judge). Further, contrary to petitioner's assertion that he
16 was not given individualized consideration, the record, as reflected in the transcripts of the
17 parole hearings, (see Answer Exs. 7-8), clearly demonstrates the Board engaged in a
18 thorough analysis and considered multiple factors in denying him parole. See Cosio, 2007
19 WL 518599, at *6 (holding petitioner's right to due process not violated where petitioner
20 failed to show Board's alleged bias "affected the board's decision or served as the basis for
21 parole denial," given that "the transcript from petitioner's . . . parole hearing demonstrate[d]
22 that he received an individualized assessment of his potential parole suitability"); cf. Martin
23 v. Marshall, 431 F. Supp. 2d 1038 (N.D. Cal. 2006) (holding Governor Davis's "no-parole
24 policy" violated petitioner's right to due process where Governor's "reasoning behind his
25 reversal of petitioner's parole grant [was] thin to the point of being pretextual").

26 Moreover, even if petitioner could establish that the Board, in 2002, had a bias
27 against paroling prisoners convicted of murder, and that petitioner was prejudiced thereby,
28 petitioner has already obtained the relief to which he would be entitled. "[T]he habeas

1  remedy [for a biased board] would be to order a new hearing by a decision-maker that was
2  not biased." See Rio v. Bd. of Prison Terms Comm'rs, No. C 05-1483 MHP (pr), 2006 WL
3  3783575, at *9 (N.D. Cal. Dec. 21, 2006) (holding claim of biased decision-maker in parole
4  context analogous to claim of biased judge in criminal case, where remedy would be new
5  trial). Petitioner was given a subsequent parole hearing in 2004 and petitioner has failed to
6  show the Board, in 2004, was biased. Although petitioner concedes "Governor Davis in
7  late 2003 was replaced by Governor Schwarzenegger[,] who began making his own
8  appointments to the Board," (see Traverse at 19: 11-12), petitioner provides no factual
9  support for his contention that Governor Schwarzenegger continued Governor Davis'
10  alleged policy with respect to parole of prisoners serving life terms. Accordingly, petitioner
11  is not entitled to relief on his claim that the Board's denials of parole in 2002 and 2004
12  violated his right to due process.

###          c.    Breach of Plea Bargain

Petitioner next argues that "the Board's denial of parole deprived [him] of the benefit of his bargain under the plea agreement while permitting the State to enjoy its benefits." (See Motion at 3:22-24.) Petitioner contends in his motion for an evidentiary hearing, albeit not in his petition,[7] that "the [trial] judge reassured [him] that he would likely serve no more than seven to ten years if he pled guilty to second degree murder." (See Motion at 11:16-18.) Petitioner further contends that it was his "understanding that his plea of guilty to second degree murder actually meant he would serve a lesser sentence than a plea of guilty to first degree murder as originally offered." (See id. at 11:18-21.)

"[D]ue process rights conferred by the federal constitution allow [a defendant] to enforce the terms of the plea agreement." Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003). Plea agreements are construed using the ordinary rules of contract interpretation. See id. at 1159. "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration,

---

[7]Because petitioner may be entitled to amend his petition to add this allegation, the Court will consider the allegation as if it were pleaded in the petition.

1  such promise must be fulfilled." Santobello v. New York, 404 U.S. 257, 262 (1971); see
2  also Brown, 337 F.3d at 1159 (holding prosecutor's promise that petitioner would be
3  released on parole after serving half the minimum sentence discipline-free was binding).
4      Assuming all of petitioner's allegations are true, petitioner has failed to state a claim
5  for relief because he has not alleged the prosecutor made any promise that petitioner
6  would be released on parole. See Murphy v. Espinoza, 401 F. Supp. 2d 1048, 1053 n.7
7  (C.D. Cal. 2005) ("Brown is inapposite because the prosecution here never promised
8  petitioner he would be released in 7-1/2 to 10 years, or even 15 years."). Petitioner's
9  "understanding" that he would be paroled after seven to ten years is immaterial because
10  that understanding was not based on any promise made by the prosecutor. See Murphy,
11  401 F. Supp. 2d at 1053 n.8 (holding petitioner's claim to be "without merit since petitioner
12  relie[d] on statements his own attorney made, and [did] not show[ ] the prosecutor made
13  him any promises").[8] Nor is the trial judge's alleged statement that petitioner "would likely
14  serve no more than seven to ten years," (see Motion at 11:16-18) (emphasis added), an
15  enforceable promise. Cf. Brown, 337 F.3d at 1158 (finding binding promise made based on
16  prosecutor's statement, "Now, if you behave yourself at the state prison . . . you are going
17  to get out in half the time.") (emphasis added); see also United States v. Morris, 827 F.2d
18  1348, 1353 (9th Cir. 1987) (holding court may explain implications of plea agreement
19  without being deemed to have become involved in plea bargaining process).
20  Consequently, petitioner's right to due process was not violated when the Board denied him
21  parole in 2002 and 2004.
22      **3.   Summary**
23      For the reasons set forth above, the state court opinions upholding the Board's 2002
24  denial of parole and summarily denying petitioner's challenge to the Board's 2004 denial of
25  parole were not "contrary to" or an "unreasonable application of" clearly established Federal
26  law or "an unreasonable determination of the facts in light of the evidence presented" in the
27
28      [8]There is no claim that petitioner's plea was not knowing and voluntary when made.

15

state court proceedings.  See 28 U.S.C. § 2254(d).  Accordingly, the petition for a writ of a habeas corpus will be denied.

### B. MOTION FOR EVIDENTIARY HEARING

#### 1. Legal Standard

A habeas petitioner is entitled to an evidentiary hearing if "(1) the petitioner's allegations, if proved, would entitle him to relief, and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts."  See Williams v. Calderon, 52 F.3d 1465, 1484 (9th Cir. 1995) (internal quotation and citation omitted).  If a petitioner raises a colorable claim for relief, "a petition may be dismissed without a hearing only when it consists solely of conclusory, unsworn statements unsupported by any proof or offer thereof."  See Phillips v. Woodford, 267 F.3d 966, 973 (9th Cir. 2001).  An evidentiary hearing is not required, however, if a petitioner cannot demonstrate that he is entitled to relief.  See Davis v. Woodford, 384 F.3d 628, 641 (9th Cir. 2004) (holding petitioner not entitled to evidentiary hearing where petitioner did not "demonstrate that he [was] entitled to relief on any claim").

Further, the district court "shall not hold an evidentiary hearing" if the petitioner "failed to develop the factual basis of a claim in State court proceedings," unless the petitioner shows (1) the claim relies on (a) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or (b) "a factual predicate that could not have been previously discovered through the exercise of due diligence," and (2) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the petitioner guilty of the underlying offense."  See 28 U.S.C. § 2254(e)(2).

"[T]he burden is on the petitioner in a habeas corpus proceeding to allege sufficient facts to support the grant of an evidentiary hearing[.]"  Dickson v. Wainright, 683 F.2d 348, 351 (11th Cir. 1982).

16

### 2. Systematic Bias

Petitioner requests an evidentiary hearing with respect to his claim that "the Board's bias and systematic arbitrary violation of its own statutory and regulatory charter for the consideration of life-sentenced prisoners for parole has retroactively increased [his] punishment, in violation of his liberty interest under the federal constitution." (See Motion at 3:19-22.) Petitioner proposes to offer "statistical and other evidence showing that the [Board] is biased." (See id. at 8:14-16.)

As discussed above in connection with the Court's ruling on the merits of the petition, even if petitioner were to prove up his allegations as to statistics, such evidence would not suffice to demonstrate bias, and petitioner has identified no "other evidence." Accordingly, petitioner is not entitled to an evidentiary hearing on his claim that the Board is biased against prisoners convicted of murder. See Davis, 384 F.3d at 641.[9]

### 3. Breach of Plea Bargain

Petitioner requests an evidentiary hearing with respect to his claim that "the Board's denial of parole deprived [him] of the benefit of his bargain under the plea agreement while permitting the State to enjoy its benefits."[10] (See Motion at 3:22-24.)

As discussed above, even assuming all of petitioner's factual allegations with respect to this claim are true, petitioner is not entitled to relief. Accordingly, an evidentiary hearing is not required with respect to this claim. See Davis, 384 F.3d at 641.

---

[9] In light of the above ruling, the Court does not reach respondent's additional argument that petitioner failed to adequately develop in state court the factual basis of his claim.

[10] In light of the above ruling, the Court does not reach respondent's additional argument that petitioner failed to adequately develop in state court the factual basis of his claim.

17

**CONCLUSION**

For the reasons set forth above,

1. Petitioner's motion for an evidentiary hearing is hereby DENIED.

2. The petition for a writ of a habeas corpus is hereby DENIED.

The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: April 26, 2007

_____
MAXINE M. CHESNEY
United States District Judge